Filed 9/10/13  Interinsurance Exchange v. Barrientos CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ADOLFO BARRIENTOS et al., <br><br> Defendants and Appellants. | D062173 <br><br><br> (Super. Ct. No. 37-2010-00060729-CU-MC-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, Robert P. Dahlquist, Judge.  Affirmed.

Ford, Walker, Haggerty & Behar, Donna Rogers Kirby for the Defendants and Appellants.

Graham Hollis APC, Graham S.P. Hollis and Brian R. Short for the Plaintiff and Respondent.

Adolfo Barrientos and Maria Enriquette Barrientos (together, Barrientos) appeal a judgment entered against them in a declaratory relief action brought by the Interinsurance

Exchange of the Automobile Club (the Exchange). Barrientos argues the trial court erred in interpreting and applying an insurance contract issued by the Exchange. As we will explain, we conclude that Barrientos's appellate arguments lack merit. Accordingly, we affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

In June 2008, Michael Norton's grandparents loaned him their car to drive to work. At about 4:30 a.m., Norton fell asleep at the wheel and drifted into the opposing lane of traffic. He collided with a vehicle driven by Adolfo Barrientos, who was seriously injured in the accident.

The parties settled the original lawsuit brought by Barrientos against Norton and his grandparents, Peter and Linda Norton (grandparents). Pursuant to the settlement agreement, Barrientos was entitled to the policy limits of the two automobile insurance policies carried by Norton and his grandparents. The parties also agreed that the Exchange would file a declaratory relief action to determine whether Norton was an insured party under an umbrella excess policy issued by the Exchange to his grandparents. If the court determined the policy provides coverage to Norton, Barrientos would also be entitled to the policy limits of that policy.

Under the umbrella policy, the Exchange agreed to "pay damages for which an *insured person* is legally liable because of *bodily injury, property damage* or *personal injury* caused by an *occurrence* to which this policy applies." (Italics in original.) The policy defines an insured person as including, among others, "a *household member*."

2

(Italics in original.)  A "*household member*," in turn, is defined as "any person who is actually residing in your household and who is:  [¶]  a. related to you by blood, marriage, adoption, or domestic partnership registered under California law."  The parties agree that the policy applies to provide coverage for Norton's liability arising from his collision with Barrientos if Norton is found to have been "actually residing" with his grandparents at the time of the occurrence.

After the Exchange filed its complaint for declaratory relief, the case proceeded to a bench trial.  The parties submitted trial briefs supported by the deposition transcripts of Norton and his grandparents.  No live testimony was presented.

The material facts discussed in the deposition transcripts are not in dispute.  At the time of the accident, Norton had no single residence; rather, he split his time between several houses.  Norton spent most nights at a friend's house in Encinitas, where he had his own bedroom.  He also occasionally slept at another friend's apartment.  Although he did not regularly stay with his father, who lived in Cardiff-by-the-Sea, all of his mail was sent to his father's address.  Likewise, his driver's license listed his father's address as his own.

In late May or early June 2008, Costco offered Norton a part-time position stocking shelves in its Carlsbad store.  The job was temporary; Norton planned to work only until he reported to Navy boot camp in November 2008.

Norton's own car was not running properly and could not make the drive to Carlsbad.  Norton planned on getting a ride to work from friends, but ultimately asked his grandparents, who lived in Fallbrook, if he could borrow one of their two cars to drive to

3

work. His grandfather agreed, so long as Norton used the car only to drive to work and returned the car immediately after work.

Norton's typical work shift began at 4:00 a.m. Given the early hour and his grandfather's requirement that he use the car only to commute to work, Norton stayed at his grandparents' house the nights before he worked. He slept at their house two or three nights a week. He never spent the night if he was not working the next day. Altogether, his grandfather estimated that Norton borrowed the car six or seven times before the accident.[1]

Norton did not pay rent to his grandparents. He explained that he stayed in a "guest room" at his grandparents' house. He had no key to the house and used the garage-door opener in the car to enter the house through the garage. He was never at the house when his grandparents were not also home. Norton kept no clothes or other belongings at the house, but rather brought a change of clothes and a toothbrush in his backpack. On at least one occasion, Norton's grandmother washed some of his clothes at the house. Occasionally, Norton ate meals with his grandparents at their house, but he never cooked food there.

In its statement of decision, the trial court did not find the term "actually residing" contained in the insurance policy's definition of "insured" to be ambiguous. The court

---

[1]     The evidence is unclear as to the exact number of nights Norton spent at his grandparents' house. The trial court considered the differing testimony of Norton and his grandparents and found that Norton spent "approximately ten nights" in his grandparents' house. We do not consider the *exact* number of nights spent by Norton to be material to the issue of whether Norton was "actually residing" at his grandparents' house.

applied the ordinary meaning of "actually residing" to the undisputed facts to conclude that Norton was not "actually residing" at his grandparents' house. The court reasoned that Norton's stays at the grandparents' house was a "matter of convenience" that related to borrowing the grandfather's car. The court entered judgment declaring the Exchange's umbrella policy does not provide coverage to Norton for the claims brought by Barrientos.

## II

## DISCUSSION

The sole issue on appeal is whether Norton was "actually residing" at his grandparents' house within the definition of "insured persons" in the grandparents' Exchange policy. Both parties contend the language in the policy is unambiguous and can be applied based on the plain meaning of the words used, but differ in their assertions of whether the undisputed facts are sufficient to establish whether Norton was "actually residing" at his grandparents' house. As we will explain, we agree with the Exchange that Norton's connections to his grandparents' house were insufficient to establish that he was "actually residing" at their house.

A.     *Standard of Review*

When reviewing the application of an insurance policy to undisputed facts, "we begin from the established rule that since the underlying facts are not in dispute '"it is the duty of the appellate court . . . to make its own independent determination of the meaning of the language used in the instrument[s] under consideration."'" (*State Farm Mut. Auto Ins. Co. v. Partridge* (1973) 10 Cal.3d 94, 100.) More specifically, "[a]ppellate courts

apply an independent standard of review to decisions interpreting, constructing, and applying insurance policies to determine the scope of actual or potential coverage." (*Food Pro Intern., Inc. v. Farmers Ins. Exchange* (2008) 169 Cal.App.4th 976, 984-985; see also *California Casualty Indemnity Exchange v. Frerichs* (1999) 74 Cal.App.4th 1446, 1450 (*Frerichs*) ["where the only question concerns a facial application of the (written) policy in the absence of a material triable issue of fact, the matter is within the purview of the appellate court"].)

B.      *Interpretation of the Phrase "Actually Residing" in the Umbrella Insurance Policy*

As with all contracts, insurance policies "must be so interpreted so as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636; *State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 194-195.) Unless the parties attach a special or technical meaning to the words in a contract, those words are to be understood "in their 'ordinary and popular sense'" rather than according to their strict legal meaning. (55 Cal.4th at p. 195.) Coverage clauses are interpreted broadly so as to afford the greatest possible protection to the insured, but the interpretation must be reasonable and not strained. (*Reserve Ins. Co. v. Pisciotta* (1982) 30 Cal.3d 800, 807, 808.)

The parties have not cited, and we have not found, any published California case that has considered the meaning of "actually residing" in the context of an insurance policy. Thus, we look to the common meaning of these words. "Reside" is defined as "to dwell permanently or continuously" or to "have a settled abode for a time." (Webster's 3d New Internat. Dict. (2002) p. 1931, col. 2.) "Actually" is defined as meaning "in act

6

or in fact" or "at the present moment." (*Id.* at p. 22, col. 3.) Considering the two definitions together, we interpret the phrase "actually residing" to mean presently dwelling in an abode with some degree of permanence.

This interpretation is consistent with case law interpreting the related terms "resident" or "residence" in insurance policies to define the persons insured by the policy. Applying an interpretation that has since been adopted by several courts, our Supreme Court held that "'residence' connotes any factual place of abode of some permanency, more than a mere temporary sojourn." (*Smith v. Smith* (1955) 45 Cal.2d 235, 238 (*Smith*); see also *Hardware Mutual Casualty Co. v. Home Indemnity Co.* (1966) 241 Cal.App.2d 303, 311 ["We think that a resident of the same household is one, other than a temporary or transient visitor, who lives together with others in the same house for a period of some duration, although he may not intend to remain there permanently"].) Reliable indicia of "residence" include: (1) the length of the stay; (2) keeping personal possessions at the house; (3) receiving mail and using the house address as an official location for a driver's license and bank account; (4) eating meals at the house; and (5) having a room reserved for the person's use. (See, e.g., *Frerichs*, *supra*, 74 Cal.App.4th at pp. 1448-1449, 1453; *Kibbee v. Blue Ridge Ins. Co.* (1999) 69 Cal.App.4th 53, 62-63 (*Kibbee*); *Utley v. Allstate Ins. Co.* (1993) 19 Cal.App.4th 815, 818-819, 823 (*Utley*).)

Barrientos contends that the term "actually residing" should be applied more broadly than the terms "resident" or "residence." We disagree.

7

In part, Barrientos suggests the two terms should be applied differently simply because "residing" is a verb and "resident" is a noun. As far as this case is concerned, however, this is a distinction without a difference. Both words derive from the same root word, namely, "reside," and it is the meaning of that root word that matters here.

We also see no reason to disregard authority interpreting the word "resident" simply because the policy here uses the term "*actually* residing." (Italics added.) Although no California court has considered the effect of the adverb "actually" to modify "residing," at least one out-of-state court interpreted "actually" as modifying "residing" to distinguish actual, physical residence from "legal residence" or domicile. (*Estate of Nicholson ex rel. Nicholson v. South Carolina Dept. of Health and Human Services* (2008) 377 S.C. 590, 597 [660 S.E.2d 303, 306].) This interpretation of "actually residing" by the South Carolina court is consistent with California case law interpreting the term "resident," which also distinguishes between residence and domicile. (See, e.g., *Smith*, *supra*, 45 Cal.2d at p. 239.) Whereas a "domicile" is the one location with which a person has the most permanent connection and intends to remain, a person may have more than one residence. (*Ibid.*; see also *Utley*, *supra*, 19 Cal.App.4th at p. 822.)

Most importantly, Barrientos's contention ignores the fact that, logically, the phrase "actually residing" describes a *narrower* subset of "residing." As the trial court observed, "[a] person can be a 'resident' of a household even if he is not currently 'actually residing' in the [insured's] household." In other words, no reasonable interpretation of the phrase would result in the conclusion that a person was "actually residing" in a household, but not "residing" in the household. Because, as we discuss

8

below, Norton was not "residing" with his grandparents, logic dictates he was not "actually residing" with them either.

C.     *Application of Interpretation of the Phrase "Actually Residing" to This Case*

Applying the factors demonstrating residence from the case law discussed above, we conclude the trial court properly determined that Norton was not "actually residing" at his grandparents' house.  Norton spent most nights at a friend's house and stayed only two or three nights a week with his grandparents.  The arrangement was not permanent, but only a temporary solution for two or three nights a week until he left for boot camp.  Norton kept no possessions at the house and, when he slept at his grandparents' house, brought only the clothes and toiletries he would need for the next day.  Although Norton stayed in a room by himself, it was considered a "guest room."  Norton had no key to the house and relied on his grandparents to unlock the front door or used the garage door opener in the borrowed car to get inside their house.  Norton was never in the house when his grandparents were not already home.  He received no mail at the house but rather used his father's address as his permanent address for mail and on his driver's license.  On these facts, Norton was not "residing," let alone "actually residing," at his grandparents' house at the time of the accident with Barrientos.  (See, e.g., *Frerichs*, *supra*, 74 Cal.App.4th at pp. 1448-1449, 1453; *Kibbee*, *supra*, 69 Cal.App.4th at pp. 62-63.)

Barrientos invites us to follow two federal district court decisions and hold there is coverage in this case.  We decline to do so, because neither decision is on point.

Barrientos contends that *Allstate Ins. Co. v. Gassmann* (C.D.Cal. Apr. 24, 2010, CV 08-04833-DSF-PLAx) 2010 U.S. Dist. Lexis 40567 (*Gassman*) considered the

question of whether a person is a "resident" with "a set of circumstances that are very similar to the facts here."[2]  Although *Gassmann* also involved a grandson living with his grandparents a few nights a week for the purpose of getting to a new job, the court in *Gassmann* relied on other indicia of residency that are not present here:  the grandson in *Gassmann* used his grandparents' address as his home address and "had his own key and unfettered access; [his grandparents' house] is where Gassmann had his own room and where he kept his toiletries and many other personal items that he valued."  (*Gassmann, supra*, U.S. Dist. Lexis 40567 at *20-*21.)

Barrientos also relies on *State Farm v. Estate of Lazio* (N.D.Cal. 1993) 822 F.Supp. 660, where the court determined the son of the policyholders was a resident of their household.  (*Id.* at p. 662.)  The son had recently sold his own house and asked his parents if he could live with them temporarily until he found a new house.  (*Id.* at p. 660.)  His parents agreed, but after staying only one night with his parents, he was involved in a motorcycle accident and died.  (*Id.* at pp. 660-661.)  The district court found the son was a resident of his parents' household primarily on the ground that "he simply had no other possible residence."  (*Id.* at p. 662.)  Here, in contrast, Norton had multiple other residences.

Applying the unambiguous language of the insurance policy to the undisputed facts, we therefore conclude Norton was not "actually residing" at his grandparents' house

---

2    Although not binding, unpublished federal district court cases are citable as persuasive authority.  (*Aleman v. AirTouch Cellular* (2012) 209 Cal.Appp.4th 556, 576, fn. 8.)

10

at the time of the accident.  Norton cannot be considered to have been "actually residing" in his grandparents' house because the undisputed evidence demonstrates that his stays were temporary visits related to borrowing his grandfather's car.  (See *Smith*, *supra*, 45 Cal.2d at p. 238 ["residence" consists of "more than a mere temporary sojourn"].)

## DISPOSITION

The judgment is affirmed.

_____

IRION, J.

WE CONCUR:

_____
BENKE, Acting P. J.


_____
McINTYRE, J.